APPEL, Justice (dissenting).
I respectfully dissent.
The main question here is what Congress meant when it declared in the Interstate Commerce Commission Termination Act (ICCTA) that "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State Law." 49 U.S.C. § 10501(b)(2) (2006). The ICCTA abolished the Interstate Commerce Commission with all its regulatory authority over rates, certificates of convenience, and gateways, and replaced the intense and detailed regulatory regime with a market-based approach.
Ordinarily, one would distinguish government economic regulation, or the legislative or quasi-legislative development of generally applicable law, from case-by-case tort law, which focuses not on economic regulation of an industry but instead on the recovery of losses caused by the harmful conduct of another. State tort law is distinct from economic regulation. The purpose of state tort law "is not to manage or govern rail transportation." Guild v. Kan. City S. Ry., 541 F. App'x 362, 367 (5th Cir. 2013). While regulations protect the public interest generally, the purpose of state tort law is to provide remedies to injured parties. See Freeman v. Grain Processing Corp. , 848 N.W.2d 58, 69-70 (Iowa 2014) (outlining differences between common law causes of action and regulatory regimes in the pollution context).
Congress, however, expressly wished to preempt state "regulation of rail transportation." State statutes and administrative regulations regarding railroad operations in the public interest are thus expressly preempted by the ICCTA. For example, a state antiblocking statute amounts to a "regulation of rail transportation" because it applies only to railroads and regulates the operations of railroads at railroad crossings. Elam v. Kan. City S. Ry. , 635 F.3d 796, 807 (5th Cir. 2011).
But there is no express language in the ICCTA suggesting that Congress sought to preempt traditional state tort law of general application. As noted by the United States Court of Appeals for the Eleventh Circuit, "Congress narrowly tailored the ICCTA pre-emption provision to displace only 'regulation,' i.e., those state laws that may reasonably be said to have the effect of 'manag[ing]' or 'govern[ing]' rail transportation." Fla. E. Coast Ry. v. City of West Palm Beach , 266 F.3d 1324, 1331 (11th Cir. 2001).
Further, courts "start with the assumption that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress."
*291 Rice v. Santa Fe Elevator Corp ., 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). This rule should be dispositive here. But even if ambiguity can be somehow engineered on the issue of preemption of traditional state tort law, "when the text of an express pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.' " Freeman , 848 N.W.2d at 76 (quoting Altria Grp., Inc. v. Good , 555 U.S. 70, 77, 129 S.Ct. 538, 543, 172 L.Ed.2d 398 (2008) ). Under current caselaw, if Congress wished to preempt state tort law under prevailing caselaw, it must use unambiguous language. It did not do so. There is no express preemption.
Beyond state law claims that directly address the economic behavior of railroads, the preemption of state tort law, if it occurs at all under the ICCTA, arises only from implied preemption. But this is an uphill road for the railroads. Implied preemption arises only when the intent of Congress to occupy the entire field is "clear and manifest." Lubben v. Chi. Cent. & Pac. R.R ., 563 N.W.2d 596, 599 (Iowa 1997) (quoting CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) ). In other words, courts do not have the authority to stretch preemption outside the four corners of the congressional language absent really strong reasons that compel such judicial improvement of the statute. There is plainly no "clear and manifest" intent in the ICCTA to preempt state tort law that does not directly affect the regulation of transportation. As a result, the district court's finding of preemption should be reversed.
But there is more. Even assuming there is a basis for implied preemption of some generally applicable state tort claims, such implied preemption should arise only when the state law tort has an incidental impact on the railroad that significantly affects the manner in which the railroad conducts its economic affairs. Determining whether the incidental impacts of tort law would functionally be the equivalent of an economic regulation is generally a fact-specific undertaking. The focus of the fact-specific inquiry should be on how important the challenged conduct is to the day-to-day economic operations of the railroad. If, without the challenged conduct, the railroad can operate perfectly well with very little economic impact, then the state law claim only incidentally affects railroad operations and does not amount to a prohibited backdoor state regulation of rail transportation, and the state law lawsuit may proceed.
In determining whether the indirect or incidental impact of a state-law tort action amounts to a "regulation of rail transportation," the amount of damage caused by the alleged tortious conduct is irrelevant. Congress did not use the preemption language to impose some kind of cap on damages. That would be a far too tortured interpretation of the plain language of § 10501(b)(2). The focus must be on the degree to which tort liability will cause a change in the economic environment under which the railroads operate in the future.
For example, in A & W Properties, Inc. v. Kansas City Southern Railway , 200 S.W.3d 342, 345 (Tex. App. 2006), a plaintiff sought to force a railroad to repair a culvert. The railroad in moving for summary judgment offered an affidavit that in order to make the changes required by the plaintiff, the railroad would have to spend more than half-a-million dollars, shut down the stretch of track temporarily, and operate trains at dramatically reduced speeds during various periods of construction. Id. at 344.
Other cases that assume that implied preemption might be available under the ICCTA require that in order for implied preemption to occur, the effect of the state claim must "unreasonably" burden or interfere with rail transportation.
*292 Or. Coast Scenic R.R. v. Or. Dep't of State Lands, 841 F.3d 1069, 1077 (9th Cir. 2016) ; Tex. Cent. Bus. Lines Corp. v. City of Midlothian , 669 F.3d 525, 530 (5th Cir. 2012) ; Elam , 635 F.3d at 805. Determining whenever a state-law tort action "unreasonably" burdens or interferes with railway transportation raises a fact question not amenable to resolution on a motion to dismiss on the pleadings. See Elam , 635 F.3d at 813 ("Our inquiry [into whether a state-law tort claim unreasonably burdens or interferes with railroad operations] is 'fact-based.' " (quoting Franks Inv. Co. v. Union Pac. R.R. , 593 F.3d 404, 414 (5th Cir. 2010) )). The burden of proving that a state cause of action "unreasonably" burdens or interferes rests with the railroad. Id. at 813-14.
In this case, there has been no factual development on the key issue. It is conceivable, for example, that a factual record might be developed that could show that the actions taken by the railroads were not only negligent, but entirely unnecessary even to protect the interests of the railroad. It could be, for instance, that other sensible alternatives were available that would have adequately protected the railroad's interests without causing dramatic adverse effects downstream and that the economic environment in which railroads operate would not be materially changed by the tort lawsuit. In short, it could well be that a tort result that says, "You cannot pile cars with rocks on railroad bridges during times of flooding," will not be a burden at all on future railroad operations because equally effective alternatives are available to the railroads. Even if the court were to adopt a broad view of implied preemption under the ICCTA, the plaintiffs are entitled to explore the issue further, and the motion to dismiss in this case, in my view, was improper.
I acknowledge, as I must, that there is an alphabet soup of federal authority that is less demanding in its preemption analysis under the ICCTA. Some of the authority has a run-for-the-exit quality, embracing a conclusory notion that unquantified and unexamined "burdens" of state tort law "unreasonably interfere" with railroad operations. For example, some federal authority broadly concludes that because the state law tort might impose costs that are "inextricably linked to rail transportation," preemption occurs. Jones Creek Inv., LLC v. Columbia County , 98 F.Supp.3d 1279, 1293 (S.D. Ga. 2015). In my view, this approach is off the mark and imports into the ICCTA a hostility to state tort law and its underlying compensatory policies at the expense of fidelity to the actual language of the ICCTA, its purpose of providing economic deregulation, and the previously generally accepted preemption principles embraced by the United States Supreme Court.
Whether the United States Supreme Court wishes to more closely align the caselaw with congressional intent and the court's traditional approach to preemption remains to be seen. In the absence of Supreme Court action, this case now sends a clear message to Congress, namely, that if Congress wishes to prevent preemption of nonregulatory state tort law and statutory law claims when it enacts economic deregulation, it had better state so expressly. The limitations of ordinary language in economic deregulation legislation are no longer a reliable barrier to expansive approaches to implied preemption.
For the above reasons, I would not run for the exit, but would reverse the holding of the district court.
Wiggins and Hecht, JJ., join this dissent.